UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

PREVIN DIXON, SR.,

    Plaintiff,

v.

Case No. 13-11051
HON. TERRENCE G. BERG
HON. DAVID R. GRAND

DEARBORN, City of, and
OFFICER ERIC CHRISTENSEN,

    Defendants.
_____/

**OPINION AND ORDER GRANTING DEFENDANTS'
MOTION FOR SUMMARY JUDGMENT**

    Plaintiff Previn Dixon, Sr., proceeding pro se, both individually and as the personal representative for the estate of his son, Previn Dixon, Jr., brings this civil rights action under 42 U.S.C. § 1983 against Defendants the City of Dearborn, Michigan and Dearborn Police Officer Eric Christensen (collectively "Defendants"). Plaintiff alleges, generally, that on March 14, 2011, Defendant Christensen shot and killed Plaintiff's son while giving chase after an armed robbery. (Dkt. 1 ¶ 9). Plaintiff further alleges that Defendant City of Dearborn, aware of its police department's pattern and practice of misconduct, ratified the unlawful conduct alleged in this case by failing to properly investigate or take corrective action. (*Id.*)

    In Count I of the Complaint, Plaintiff alleges that Defendants violated Previn Dixon, Jr.'s due process and equal protection rights under the Fourteenth Amendment, his right to be free from excessive force under the Fourth Amendment,

and his right to be free from cruel and unusual punishment under the Eighth Amendment. (Dkt. 1 at ¶¶ 17-25.) In Count II, Plaintiff alleges that Defendant Christensen committed assault and battery against the deceased by intentionally using excessive and deadly force. (*Id*. at ¶¶ 26-30.) Plaintiff alleges in Count III that Defendants intentionally caused him severe emotional distress when they breached their duty to Plaintiff to refrain from extreme and outrageous actions. (*Id*. at ¶¶ 31-37.) Finally, in Count IV, Plaintiff alleges that Defendants were grossly negligent in the death of his son. (*Id*. at ¶¶ 38-42.)

On February 3, 2014, Defendants filed for summary judgment on all of Plaintiff's claims. (Dkt. 26). On February 11, 2014, Plaintiff filed a "Determination of Motion without Oral Argument" that the Court construes as a response. (Dkt. 28). Defendants filed a reply on March 27, 2014. (Dkt. 30). The Court has reviewed the parties' filings, and finds that oral argument will not significantly aid the decision making process. Thus, under E.D.Mich. LR 7.1(f)(2), no hearing will be held.

While the Court in no way minimizes the pain and suffering Plaintiff has experienced from the loss of his son, it is bound by the law to determine whether the available evidence gives rise to any genuine issue of material fact as to whether Defendants engaged in misconduct. After carefully reviewing all the evidence in the record, the Court concludes that there is simply no credible, admissible, evidence sufficient to raise a genuine issue of material fact on this question. Therefore Defendants are entitled to summary judgment. Accordingly, Defendants' motion for

2

summary judgment (Dkt. 26) is GRANTED, and Plaintiff's Complaint is DISMISSED WITH PREJUDICE.

## I.   FACTUAL BACKGROUND

On March 14, 2011 at approximately 9:15 am, Miriam Saad, the owner of Starters Bar and Grill in the Fairlane Town Center in Dearborn, Michigan, reported that she had been robbed of about $10,500 in cash by a black male armed with a handgun. (Dkt. 26, Ex. A at 2-3.) Once the initial danger had passed, Ms. Saad got into her vehicle, while on the phone with 911 dispatch, and drove in the direction the suspect had run. (*Id.* at 3.) Ms. Saad observed three black males in a white vehicle with a tan convertible top driving rapidly towards Outer Ring Road and followed it, informing dispatch of its route. (*Id.* at 3-4.) Dispatch broadcast the information and several officers responded, including Defendant Christensen who was the lead patrol car in the ensuing pursuit. (*Id.* at 6.)

The suspects' vehicle was speeding and weaving through traffic and eventually drove north on the Southfield Service Drive, crossing Warren and Tireman Avenues, until it was approaching Joy Road. (*Id.* at 4.) The vehicle's rear passenger door was partially open during the pursuit. (*Id.* at 9.) When the suspect's vehicle tried to make a west bound turn onto Joy Road, it jumped the curb and crashed into a wall. (Dkt. 26, Ex. A at 5.) A Detroit Police Department Evidence Technician Report states that vinyl trim on the rear passenger door of the car was protruding out and that the rear vent window was shattered, indicating that shots were fired

from inside the suspects' vehicle, and a "9MM Luger shell casing" was recovered "near the rear of the vehicle" on a cement berm. (Dkt. 26, Ex. E at 3.)

Prior to hitting the wall, all three suspects fled the vehicle on foot. (Dkt. 26, Ex. A at 5.) The suspect who exited from the passenger's side was apprehended without a weapon and later identified as Charles Edward Rhodes. Mr. Rhodes informed police that Previn Dixon, Jr. had been the gunman in the robbery. (*Id.* at 7-8, 15.) A second suspect, identified as "Norfolk," was apprehended within an hour by the Michigan State Police. (*Id.* at 10.) No weapon was recovered from Norfolk. (*Id.*)

The suspect later identified as Mr. Dixon fled from the back seat and ran westbound on Joy Road, followed by Defendant Christensen in his patrol car. (*Id.* at 9.) Mr. Dixon was carrying a handgun, later identified as an Astra model A100 9mm semiautomatic pistol. (Dkt. 28, Ex. D at 4-5; Dkt. 26, Ex. 2 at 5, 9; Dkt. 26, Ex. F at 5). Mr. Dixon continued running down Joy Road toward a McDonald's restaurant and reached Ashton Street with Defendant Christensen still in pursuit in his patrol car. (Dkt. 28, Ex. B March 14, 2011 Security Camera Footage from McDonald's)[1] Mr. Dixon then turned down Ashton Street. (*Id.* at 08:20:42.) Almost immediately after, Mr. Dixon stopped and turned toward Defendant Christensen's patrol car as it was slowing down on Joy Road in preparation to turn onto Ashton Street. (*Id.* at 08:20:45.) As Defendant Christensen's patrol car began to turn left from Joy Road

---

[1] This footage was captured by a security camera at the McDonald's restaurant located at the corner of Joy Road and Ashton Street. Both parties have submitted this video as evidence. (Dkt. 26, Ex. C; Dkt. 28, Ex. B). The events the video captures are summarized on the basis of the Court's close review of that recording. The video's time stamp is one hour earlier than the actual time of events. There is no audio on the video.

4

down Ashton Street, Mr. Dixon suddenly collapsed on the ground.[2] (*Id.* at 08:20:48.) Mr. Dixon did not move as Defendant Christensen's vehicle pulled up to him. (*Id.* at 08:20:53.) Defendant Christensen parked and exited his vehicle as a second patrol car arrived on Ashton Street. (*Id.* at 08:20:59.)

Upon arriving at the scene, Defendant Christensen, as witnessed by another officer, ran toward Mr. Dixon and immediately used his foot to slide a gun away from Mr. Dixon's body. (Dkt. 26, Ex. A at 9, 10.) Defendant Christensen, and another officer who secured the scene, then called the Dearborn Fire Department Rescue. (Dkt. 26, Ex. A at 6, 9.) Three paramedics arrived and checked Mr. Dixon within 20 minutes of his collapse. (Dkt. 26, Ex. A at 6.) Mr. Dixon was confirmed dead at the scene by a Dr. Yangoian. (*Id.*)

A "black semi[-]automatic 9MM handgun was found on the street just north" of Mr. Dixon. (Dkt. 26, Ex. E at 3.) The weapon's hammer was in the back position with a live round in the chamber and a magazine inserted. (*Id.* at 4.) On Ashton Street, a 9mm shell casing was found 16 feet east of the west curb and a fired bullet was removed from the plastic casing of an electronic meter on a southwest corner wall. (*Id.*) The Michigan State Police Forensic Science Division determined that this shell casing and bullet, as well as the shell casing recovered near the suspect vehicle on Joy Road, were all fired from the same Astra model A100 9mm semiautomatic pistol found near Mr. Dixon's body on Ashton Street. (Dkt. 28, Ex. J

---

[2] The Evidence Technician Report stated that Mr. Dixon's body was "found on Ashton Street approximately 69 ' south of Joy Road."  (Dkt. 26-6, Ex. E at 3.)

at 3-4.) These were the only shell casings and fired bullet recovered from the scene. (*Id.*)

Defendant Christensen was taken to the Dearborn Police Station where he surrendered his department-issue Glock 27 pistol and his two spare magazines to Sargent Matt Cannon, as witnessed by Captain Stan Chiles. (Dkt. 26, Ex. A at 9, 20.) Sargent Cannon inspected the pistol and determined that it was "fully loaded with a cartridge in the firing chamber and 15 cartridges in the magazine" and that the two spare magazines "also contained 15 cartridges each," thus indicating that Defendant Christensen did not fire his service weapon during his pursuit of Mr. Dixon (*Id.* at 20.)

Detroit Police officers responding to the scene interviewed a witness, Ms. Heather Martin, whose statement indicated that "she witness the whole thing, she stated an unk[nown] Dearborn officer got out of his car and shot the suspect in the back of the head with a rifle" and that "it was wrong for them to shoot him in the head like that, no matter what that boy did wrong." (Dkt. 28, Ex. D). Ms. Martin was later interviewed by Detroit Homicide detectives on May 19, 2011, and signed a statement that states, in relevant part, "A Dearborn police car was slowly approaching the guy that was running. I saw the police officer aim out of his window with his gun. His right hand was over his left. He fired one shot. I didn't see the guy fall. I had my boyfriend drive around the block and I saw the guy lying in the street." (Dkt. 28, Ex. D at 17.)

6

The Homicide detectives also interviewed a Mr. Jopez Johnson on May 17, 2011. Mr. Johnson gave a statement in which he said: "I was taking out my trash. Once I stepped out on my porch, I could look out over Joy Rd. I see a guy running and I see a police officer chasing him. I ran down off my porch to the walkway to see what was happening. I see the guy running and the officer chasing him. They were running southbound on Ashton. I see the officer pull his gun and shoot the guy one time. One shot was all I heard and saw." (*Id.* at 20.)

Wayne County Medical Examiner Dr. Lokman Sung performed a postmortem examination of Mr. Dixon on March 15, 2011. (Dkt. 28, Ex. G at 1.) Dr. Sung determined that Mr. Dixon had died of a "contact gunshot wound to the head" with an entry wound on the right parietal scalp, leaving a "minimal amount of soot," and an exit wound through the left temporal scalp. (*Id.* at 1-2.) Mr. Dixon, according to Plaintiff, was right-handed. (Dkt. 28 at 4.) No bullet was recovered from Mr. Dixon's body. Dr. Sung classified Mr. Dixon's death as a suicide. (Dkt. 28, Ex. G at 2.)

Dr. Werner Spitz, retained by Plaintiff, conducted a second postmortem examination of Mr. Dixon on March 17, 2011 and confirmed Dr. Sung's finding of the gunshot wound location and the bullet's right-to-left track, with a "small amount of soot on the skull surrounding the entrance wound and on the interior surface of the bone."[3] (Dkt. 28, Ex. A at 3-4.) Dr. Spitz was silent on whether the

---

[3] Plaintiff submitted two photographs of what he claims is Mr. Dixon's left ear taken by an unnamed photographer at James Cole Funeral Home on March 20, 2011. (Dkt 28 at 3; Dkt. 28, Ex. I.) Plaintiff asserts that these photographs show that "[t]he actual entrance wound was in the back of [Mr. Dixon's] head, near his left ear." The copies of these photographs in the record did not reproduce well, making it difficult to see what the Plaintiff refers to as a wound. Both autopsy reports, however, confirm that the entry wound was on the right side of Mr. Dixon's head. (Dkt. 28, Exs. A, B, G.) When one party's version of events "is blatantly contradicted by the record, so that no reasonable

7

gunshot wound was self-inflicted. (*Id.*) Mr. Dixon did not sustain any other injuries. (Dkt. 28, Ex. A; Dkt. 28, Ex. G).

## II. LEGAL STANDARD

Defendants have now have moved for summary judgment, arguing that Plaintiff has not produced any credible, admissible, evidence of Defendants' misconduct in the death of Mr. Dixon. (Dkt. 26). "Summary judgment is appropriate if the pleadings, depositions, answers to interrogatories, and admissions on file, together with any affidavits, show that there is no genuine issue as to any material fact such that the movant is entitled to a judgment as a matter of law." *Villegas v. Metro. Gov't of Nashville*, 709 F.3d 563, 568 (6th Cir. 2013); *see also* Fed. R. Civ. P. 56(a). A fact is material only if it might affect the outcome of the case under the governing law. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986). On a motion for summary judgment, the Court must view the evidence, and any reasonable inferences drawn from the evidence, in the light most favorable to the non-moving party. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (citations omitted); *Redding v. St. Edward*, 241 F.3d 530, 531 (6th Cir. 2001).

"As the moving parties, the defendants have the initial burden to show that there is an absence of evidence to support [plaintiff's] case." *Selhv v. Caruso*, 734 F.3d 554 (6th Cir. 2013); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986). Once the moving party has met its burden, the non-moving party "'may not rest

---

jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment." *Scott v. Harris*, 550 U.S. 372, 380 (2007)

upon its mere allegations or denials of the adverse party's pleadings, but rather must set forth specific facts showing that there is a genuine issue for trial.'" *Ellington v. City of E. Cleveland*, 689 F.3d 549, 552 (6th Cir. 2012) (citing *Moldowan v. City of Warren*, 578 F.3d 351, 374 (6th Cir.2009)).

Here, there is insufficient credible, admissible, evidence to create a genuine issue of material fact in this case. On the basis of the videotape, ballistic and other forensic evidence, the Court finds that a reasonable jury could not conclude that Defendants engaged in any unlawful conduct. Although the Court recognizes that Plaintiff is a father who has suffered the grievous loss of a child, and is understandably seeking redress for that loss, there is insufficient evidence to support Plaintiff's claims. Therefore, Defendants are entitled to summary judgment in their favor.

### III.    ANALYSIS

Plaintiff's claims fail because there is insufficient credible, admissible, evidence of an unlawful use of force against Plaintiff. In response to Defendants' motion for summary judgment, Plaintiff relies primarily on the statements of two alleged eye witnesses, Ms. Heather Martin and Mr. Jopez Johnson, the McDonald's security camera footage, and Dr. Spitz's report. (Dkt. 28 at 2.)[4]

Although opposing witness statements that provide conflicting versions of material facts are normally sufficient to create a genuine issue of fact, in this case the witness statements are contradicted by a contemporaneous videotape of the

---

[4] Plaintiff also relies on statements made by Richard Heartsville and a "very frightened female eyewitness." (Dkt. 28 at 1-2.) Because Plaintiff does not provide any direct statement from either of these potential eyewitnesses, the Court cannot consider this evidence to be admissible.

incident, and by uncontroverted forensic evidence. The eye witness accounts cannot be accepted as credible because they are clearly refuted by the video evidence, upon which Plaintiff also relies, as well as by the available forensic evidence. Facts must be viewed in the light most favorable to the nonmoving party at the summary judgment stage, but where videotape evidence "blatantly contradicts" this version of events, the Court must "view[ ] the facts in the light depicted by the videotape." *Austin v. Redford Tp. Police Dept.*, 690 F.3d 490, 493 (6th Cir. 2012) (quoting *Scott v. Harris*, 550 U.S. 372, 380–82 (2007)).

Mr. Johnson's account is contradicted by the McDonald's security camera footage as well as other forensic evidence. Mr. Johnson gave a statement on May 17, 2011; nearly two months after the events in question took place. (Dkt. 28, Ex. E at 1.) According to Mr. Johnson, Mr. Dixon was pursued on foot by an officer who shot him from 4 or 5 feet behind. (*Id.* at 1-2.) After Mr. Dixon fell, the officer on foot met up with a police car and said something to the officer in the car who then parked on the corner of Joy Road and Ashton Street. (*Id.* at 1.)

Although the videotape is not of perfect quality, it provides a full view of the surrounding area where Mr. Dixon was, in broad daylight, and clearly shows that no one was pursuing Mr. Dixon on foot, no one shot at him from behind, no one was standing by his body when Defendant Christensen arrived in his patrol car and no one spoke to Defendant Christensen through his patrol car window as or after he pulled up to Mr. Dixon. (Dkt. 28, Ex. B.) Mr. Dixon is clearly visible in the video, alone in the middle of the street, when he collapses to the ground. The vantage

point of the camera is too distant to see what causes Mr. Dixon to fall, but there is no other person standing near him. The only police vehicle in the vicinity of Mr. Dixon, Officer Christensen's, is still in motion, at the intersection of Joy Road and Ashton Street, when Mr. Dixon falls to the ground.

Dr. Sung determined that Mr. Dixon died of a contact gunshot wound that left "a minimal amount of soot" on a laceration radiating from the entrance wound. (Dkt. 28, Ex. G at 2.) Dr. Spitz, retained by Plaintiff, did not explicitly state in his review of Dr. Sung's findings whether Mr. Dixon's wound was from a contact gunshot, but did note the presence of soot "on the skull surrounding the entrance wound." (Dkt. 28, Ex. A at 4.) A contact wound results "when the weapon is fired with the muzzle in contact with the body." Spitz, Daniel J et al., Spitz and Fisher's Medicolegal Investigation of Death: Guidelines for the Application of Pathology to Crime Investigation 608 (Werner U. Spitz et al. eds., 4th ed. 2006). Gunpowder and soot can be found on the skin around a contact wound when "contact with the muzzle was loose" or the weapon used had "a loosely fitting cylinder," and "[s]oot is frequently deposited on the bone underlying a contact bullet wound." *Id*. at 611, 616. Thus both autopsies describe a wound consistent with a contact gunshot. In addition, both reports confirm that the bullet entered the right side of Mr. Dixon's head and exited through the left. (Dkt 28, Ex. A; Dkt. 28, Ex. G at 1.) This evidence, in addition to the videotape, directly contradicts Mr. Johnson's account that Mr.

Dixon was shot by an officer running behind him, thus no reasonable jury could believe it.[5]

Ms. Martin gave two contradictory statements. In her initial statement, given on March 14, 2011, Ms. Martin told the Detroit Police Department that she saw a Dearborn officer get out of his car and shoot Mr. Dixon "in the back of the head with a rifle." (Dkt. 28, Ex. D at 1.) Neither the videotape nor forensic evidence supports this version of events. Moreover, Defendant Christensen and Mr. Dixon were not carrying rifles on the day in question; both men were armed with pistols.

Over two months later, on May 19, 2011, Ms. Martin gave a second statement to the Detroit Police Department that corroborated most of the events depicted in the videotape. In this second version, Ms. Martin asserts that Mr. Dixon ran in front of her truck at a gas station and was headed toward Ashton Street. (Dkt. 28, Ex. D at 4.) Mr. Dixon had a "9mm or 45 cal." handgun in his right hand and was being pursued by a "slowly approaching" Dearborn police car. (*Id.* at 4-5.) Ms. Martin "heard one shot" but "didn't see the guy fall." (*Id.*) She "saw the guy lying the street," but only after driving around the block with her boyfriend. (*Id.*)

While Ms. Martin also claims that the police officer in pursuit was aiming "out of his window with his gun" and that he "fired one shot" (*Id.* at 4), the ballistics evidence confirms that only the Astra model A100 9mm semiautomatic pistol, which

---

[5] The forensic evidence also showed that the weapon found near Mr. Dixon had been fired, its shell casing was found there in the street, and the bullet from the weapon was lodged in a meter box attached to a building on the west side of Ashton Street, which is consistent with a trajectory of a shot fired from the right side of Mr. Dixon and traveling to the left, or the west. No shell casings from any law enforcement weapons were found, and there was no evidence that any law enforcement weapon had been fired.

Ms. Martin saw Mr. Dixon carrying, was discharged at the scene. (Dkt. 28, Ex. J at 3-4.) Defendant Christensen's weapon had not been fired. (Dkt. 26, Ex. A at 20.) Even when viewed in the light most favorable to Plaintiff, neither of Ms. Martin's statements creates a genuine issue of material fact given the videotape and forensic evidence.

Neither the videotape nor the autopsy by Dr. Spitz creates any genuine issue of material fact of any misconduct on the part of Defendants. Dr. Spitz's report does not contradict Dr. Sung's findings, even though it remains silent on the question of suicide. (Dkt. 28, Ex. A.)  The videotape shows Defendant Christensen pursuing Mr. Dixon in his patrol car as Mr. Dixon runs along a busy Joy Road before he darts onto Ashton Street, turns to face the patrol car, and collapses as Defendant Christensen turns his patrol vehicle onto Ashton Street, pulls up to Mr. Dixon, parks, and exits the car. (Dkt. 28, Ex. B.) There is no indication on the videotape that Defendant Christensen shot or otherwise assaulted Mr. Dixon in any way. Indeed, it is possible to pause the video at the instance when Mr. Dixon collapses, and one can plainly see that Defendant Christensen's patrol car has not yet completed its turn from Joy Road onto Ashton Street when Mr. Dixon falls.

There is no evidence to explain how Defendant Christensen would have been able to get close enough to Mr. Dixon to leave him with a contact bullet wound. Even assuming that Defendant Christensen did shoot at Mr. Dixon from his patrol car, Plaintiff does not offer any credible, admissible, evidence to explain how, given that Defendant Christensen's pistol was not fired, Defendant Christensen could

13

have obtained Mr. Dixon's weapon prior to the chase and fired the fatal shot at close range to Mr. Dixon's head. Given their respective positions at the time when Mr. Dixon fell, a shot being fired from Defendant Christensen's vehicle would be expected to hit Mr. Dixon in the front of his body considering that he was facing Defendant Christensen's car when he collapsed. (*Id.* at 08:20:45.) In summary, Plaintiff's witness statements do not credibly refute the videotape or the ballistics and autopsy evidence.

Because there is insufficient credible, admissible, evidence to create a jury question of misconduct on the part of Defendants, there is no unlawful state action upon which Plaintiff can base his Section 1983 claims. The United States Supreme Court clarified in *Scott v. Harris* that facts must be viewed in the light most favorable to the nonmoving party at the summary judgment stage "only if there is a 'genuine' dispute as to those facts." 550 U.S. at 380. There is no genuine dispute if one party's version of the facts is blatantly contradicted by objective evidence in the record such as a videotape. *Id.* at 378-81. In *Scott,* although the Plaintiff and the Defendant police officer gave conflicting testimony about what happened during a high-speed chase, the Court found that no genuine issue of material fact existed because a videotape included in the record blatantly contradicted the Plaintiff's testimony that he had been driving carefully during the pursuit. *Id.* at 379, 386.

In this Circuit, as in *Scott,* determining whether a genuine issue of fact exists requires an analysis of all objective evidence in the record including but not limited to videotape recordings. *E.g.*, *Coble v. City of White House, Tenn.*, 634 F.3d 865, 868-

69 (6th Cir. 2011) (extending the *Scott* analysis to an audio recording because "[t]he *Scott* opinion does not focus on the characteristics of a videotape, but on 'the record'"). When such evidence blatantly contradicts a party's version of facts, the Court must adopt the facts as established by that evidence. *See e.g., Booher ex rel. T.W. v. Montavon*, 555 F. App'x 479, 484 (6th Cir. 2014) (disregarding eyewitness testimony that an officer twisted a juvenile's wrist as insufficient to create a genuine issue of material fact because it was blatantly contradicted by medical evidence); *Khother v. DeEulis*, 527 F. App'x 461, 462-63 (6th Cir. 2013) (adopting the facts as presented in a videotape that blatantly contradicted a Plaintiff's claim that his head was slammed into the booking desk); *Austin*, 690 F.3d at 493 (to the extent that videotape evidence blatantly contradicts a version of events, the Court "must view [ ] the facts in the light depicted by the videotape"); *Coble*, 634 F.3d at 868-69 (examining whether a Plaintiff's testimony was blatantly contradicted by an audio recording).

As the *Scott* Court made clear, "[w]hen opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment." 550 U.S. at 380. Here, the Court finds that Plaintiff's version of events is blatantly contradicted by the videotape and forensic evidence in the record. Thus, Defendants are entitled to summary judgment in their favor on all of Plaintiff's claims.

15

The Court also notes that neither Plaintiff's claim of intentional infliction of emotional distress (Count III) nor gross negligence (Count IV) are cognizable under 42 U.S.C. § 1983. This Circuit has never "held that intentional infliction of emotional distress, by itself, amounts to a cognizable constitutional claim remediable pursuant to 42 U.S.C. § 1983." *Voyticky v. Vill. of Timberlake, Ohio*, 412 F.3d 669, 678 (6th Cir. 2005). In addition, "[g]ross negligence is not actionable under § 1983, because it is not 'arbitrary in the constitutional sense.'" *Lewellen v. Metro. Gov't of Nashville & Davidson Cnty., Tenn.*, 34 F.3d 345, 351 (6th Cir. 1994) (quoting *Collins v. City of Harker Heights, Tex.*, 503 U.S. 115, 130 (1992)). *See also Gazette v. City of Pontiac*, 41 F.3d 1061, 1066 (6th Cir. 1994) ("gross negligence is not the type of government action needed to support a Section 1983 claim"). Because neither of these claims is remediable under 42 U.S.C. § 1983, Counts III and IV fail to state a claim upon which relief can be granted.

//
//
//
//
//
//
//
//
//

## IV. CONCLUSION

Because the Court finds that Plaintiff's version of facts is blatantly contradicted by the record, Defendants' motion for summary judgment (Dkt. 26) is **GRANTED**. Accordingly, Plaintiff's Complaint is **DISMISSED WITH PREJUDICE**.

**SO ORDERED**.

Dated: September 29, 2014          s/Terrence G. Berg
                                              TERRENCE G. BERG
                                              UNITED STATES DISTRICT JUDGE

**Certificate of Service**

I hereby certify that this Order was electronically submitted on September 29, 2014, using the CM/ECF system, and served upon parties of record via CM/ECF and/or postal mail.

                                              s/A. Chubb
                                              Case Manager